do so only in the way here pointed out. He is not at liberty to adopt any service of papers by his adversary as a substitute for the service in this section required. The service made by his adversary is not upon the appellant, but upon the respondent, and a written admission of such service by respondent adds nothing to it. Obviously, such service by the appellant was not made to start the time running against himself. The service, when made as prescribed by this section,—by the prevailing party upon the defeated party,—is a declaration by the prevailing party to his adversary that he intends to invoke the aid of this short bar, and unless an appeal is taken within 30 days it cannot be taken at all. The cases of Coal Co. v. Dyett, 4 Paige, 275, and Jenkins v. Wild, 14 Wend. 545, to which our attention is called by respondent, were cases in the chancery court giving effect to provisions of the Revised Statutes materially differing from the Code provisions, and are inapplicable here. The case of Piper v. Van Buren, 27 Hun, 385, assumed that the time for appeal from the order had expired, and the motion there was, on that assumption, to amend the notice of appeal from the judgment. The precise question presented here does not seem to have been discussed or passed upon in the case last cited, though it must be conceded that what is asserted in the opinion there expressed, bears upon this question. In Kilmer v. Hathorn, 78 N. Y. 231, it is said:

"Though the Code does not say so, it is plain that the notice spoken of must be one coming from a party interested in the judgment, as the party who prevailed thereby."

If the only purpose of the notice is to convey to the defeated party knowledge of his defeat, and the extent of it, then it might be reasonably urged that, the defeated party having procured and entered and served the order and notice, he was fully advised of its contents, and service by the prevailing party would be useless; but such is not the sole purpose of the section. Its chief purpose is to point out a way to the prevailing party,—a way to end the litigation; and, if he chooses to adopt it, he may limit his adversary to 30 days in which to appeal.

The motion should be denied, with $10 costs. All concur.

---

(47 App. Div. 214.)

In re KEEFE'S WILL.

(Supreme Court, Appellate Division, Third Department. January 8, 1900.)

1. WILLS—EXECUTION—FRAUD AND UNDUE INFLUENCE—PROOF.
    Proof of motive and opportunity are not sufficient to show that a will was induced by fraud and undue influence; it being conceded that there was no proof of any particular act, or attempt to influence the testator in any way.

2. SAME—PRESUMPTION.
    It cannot be presumed that the scrivener and an old friend of a testator, present at the execution of his will, were acting in behalf of the beneficiaries in inducing the execution of the will, because the husband of the principal beneficiary communicated to them the testator's wish to make the will, and was instrumental in getting them to call at the testator's house; there being no one else about it who could render such service.

**3. SAME.**

It is no evidence of fraud or undue influence that a testator did not provide for an aged maiden sister, with whom he lived, as bountifully in his last will as in a will executed 15 years before,—she being in the house, knowing that the will was being written, and apparently satisfied with its provisions,—nor that he made other changes from his former will as to other relations.

**4. SAME.**

It cannot be presumed, solely from a physician's attendance on a testator in his last illness, during which he executed his will, giving the physician's wife the bulk of his estate, that the physician practiced fraud or undue influence, inducing the will in her favor.

**5. SAME—VACATION—APPEAL—REVERSAL—ISSUE FOR JURY.**

Where there is no conflict as to the facts on which the probate of a will was vacated, there is no issue for submission to a jury on the reversal of the decree of revocation.

Appeal from surrogate's court, Rensselaer county.

In the matter of the application of Anna M. Miller for the revocation of the probate of the last will and testament of John Keefe, deceased. From a decree of revocation (59 N. Y. Supp. 490), Margaret Keefe and others appeal. Reversed, and the original decree probating the will affirmed.

John Keefe, the testator, died June 7, 1898, leaving a last will executed June 5, 1898. The will was duly probated in the surrogate's court of Rensselaer county June 21, 1898; citation having been served upon the beneficiaries named in the will and upon Anna M. Miller, the applicant in this proceeding for revocation. Letters testamentary were issued to the executor named in the will, and he took possession of the personal estate. The estate consisted of a farm worth from $12,000 to $20,000, and personal property worth about $3,500. Six months later Anna M. Miller, sister of deceased, filed a petition with the surrogate asking for revocation of the decree admitting the will to probate. The petition alleges all the usual grounds in such cases, and among these that the will was procured by "fraud, artifices, circumvention, and undue and improper influences" practiced by Henry Pratt, Matilda Pratt, and William W. Grey, and other persons unknown to the petitioner. After a hearing the surrogate directed a revocation of the decree admitting the will to probate as a will of personal property, on the ground that the execution of the will was procured by "fraud, artifices, circumvention, and undue and improper influences practiced against and exerted upon the said John Keefe by or at the instigation of the said Henry Pratt, who was his only attending physician at the time, and by his wife, Matilda Pratt." The record does not disclose that any of the next of kin or heirs at law other than Anna M. Miller took part in the proceedings for revocation. Exceptions to the conclusions of the surrogate were filed and an appeal taken from this decree by Margaret Keefe, a sister of deceased, and by Henry Pratt, Matilda Pratt, and the special guardian of the infants, Henry E. Pratt and James M. Pratt. Pending this appeal, and by order of this appellate division, three adult children of a deceased half-brother were brought in, but the record does not show that any one of these has appeared either in person or by counsel.

Argued before PARKER, P. J., and LANDON, HERRICK, MERWIN, and KELLOGG, JJ.

Robert W. Hardie (Edwin Countryman, of counsel), for appellants. Tennant & Oliver (Albert C. Tennant, of counsel), for respondents.

KELLOGG, J. There is no conflict in the testimony in this case touching any material fact. All these stand undisputed. It is only with the conclusions of the learned surrogate we have to do. There

is no room for diverse inferences from the conceded facts. The case presents, therefore, only a question of law, viz. are the conclusions of the surrogate that the will was procured by fraud, etc., supported in any degree by the undisputed facts? The surrogate finds as a fact (and this finding cannot be controverted) "that said will is sufficiently proven to have been signed, published, and declared and attested in full compliance with the law and the statute in such case made and provided." This disposes of the testimony of the witness Havens, so far at least as it tends to discredit the proper execution of the will. The surrogate does not find that at the time the will was executed the testator was not possessed of testamentary capacity, and the proof seems to establish, beyond dispute, that he was; that his mind and memory were sound, and his mental faculties unimpaired; that he possessed a clear understanding of his affairs, his surroundings, his relations, and obligations. He had been ill only four days. His trouble was a valvular trouble of the heart, —a difficulty not usually painful. It disturbed his breathing somewhat on the day the will was made. On the Wednesday prior to the Sunday on which the will was made, he drove alone some two or three miles to get some medicine, and drove home. On Thursday Dr. Pratt called at his house. On Friday Dr. Hailes, of Albany, was sent for. The testator asked Dr. Hailes if there was any danger, saying that, if there was, he had some business matters he would like to straighten up; that he had made a will about 20 years before, and that was a pretty long time, and he would like to make a new will. He said a great many changes had taken place during that time. Dr. Hailes told him that at his age the trouble might take an unfavorable turn, and told him "he better make it." That night Mr. Grey, an old friend of the testator (a man of character and standing, residing in Albany, for many years the treasurer or assistant manager of the Albany Brewing Company), came, and with him also came Mr. Waterbury, an acquaintance of the testator, a lawyer, not connected in any professional way with any of the beneficiaries under the will, and also, so far as appears, of good repute in his profession. The testator said to Mr. Grey when he first arrived and had shaken hands: "How do you do? Glad to see you. Have you got the lawyer with you? I want to draw a will." The testator then asked the lawyer if he could draw a will devising the farm and not the personal property, and said he wanted the farm to go to Matilda Pratt, wife of the doctor; that it was better to put it in her name, rather than in the doctor's. He then gave to the scrivener directions as to this will. Mr. Waterbury says:

"He told me that he wanted to make certain that she should have the farm, and that after he got around—he would be out in a few days—he would have me prepare a will."

The will was then prepared and executed that night, but it did not mention the personal estate. The farm was the great bulk, in value, of his property. All of this was done in the absence of all the beneficiaries. It nowhere appears that the subject of the disposition of his property had been discussed by the testator with any

of the beneficiaries, or by any of them in his presence. The learned surrogate says as to this Friday night will:

"On Friday night, June 3d, the testator executed a will. This was probably because of the advice given him that day by Dr. Hailes. It was either the first or second day after he was taken sick, and there is little, if any, doubt as to his testamentary capacity at that time. He was in full possession of his mind, and he gave intelligent and explicit directions as to what he wanted, and what he did not want, done."

No fault can be found with this conclusion. The Friday night will has this bearing upon the Sunday will: The will executed on Sunday retained the provision as to the farm of the Friday will, and in addition disposed of the small remaining property,—the personal property. This conclusion of the surrogate as to the testamentary capacity of the testator may be taken also as his conclusion as to capacity of the testator on Sunday, for he presents in the record no different conclusion on that subject. The record also presents a statement on the part of the surrogate, which relates to both wills, in this language:

"There is no reliable evidence of any particular act or attempt on the part of any one connected with the case to influence the testator's mind as to the disposition of his property."

A careful examination of the testimony will, I think, force the most easily biased mind to the same conclusion. There is no "act or attempt," and no proper inference can be drawn from any of the proven facts that there was any "attempt," of the nature mentioned. It would seem from what the learned surrogate has said in the record showing upon what he based his conclusion of fraud, etc., that he gave great weight to "opportunity." Of course, opportunity is a necessary factor, always, in identifying the perpetrator of a crime; but to establish the primary fact, viz. that a crime has in fact been committed, neither motive nor opportunity has any probative force. Applying this principle to the proof of fraud and undue influence in the execution of wills, it was said by Rapallo, J., in Cudney v. Cudney, 68 N. Y. 148:

"To invalidate a will on the ground of undue influence, there must be affirmative evidence of the facts from which such evidence is to be inferred. It is not sufficient to show that the party benefited by a will had the motive and opportunity to exert such influence. There must be evidence that he did exert it, and so control the action of the testator, either by importunities that he could not resist, or by deception, fraud, or other improper means, that the instrument is really not the will of the testator."

I think the learned surrogate gave more weight to opportunity in this case than the facts warrant. There was in fact no opportunity to practice fraud or deception or undue influence by any of the beneficiaries at the time either the Friday or the Sunday will was executed. Neither of them was present when the provisions of either will were dictated, written out, or when the wills were executed. It would be a violent presumption to presume that Mr. Grey or Mr. Waterbury, or either of them, was acting as the criminal tool of any of the beneficiaries, when there is not a particle of proof to sustain it. Such a presumption cannot be based upon

the fact that Dr. Pratt communicated to them the wishes of the testator, that he wanted to make a will, or that Dr. Pratt was instrumental in getting them there. No one else was about the house of the testator who could render to him this service. That they came on Friday at the expressed wish of the testator is indicated by the testator's asking of Mr. Grey: "Did you bring the lawyer? I want to make a will." But it may be sufficient that the surrogate has not declared a presumption so groundless. He has left it, however, somewhat in the air, in his finding of "fraud, artifices, circumvention, and undue influence" practiced by Henry Pratt and Matilda, his wife, or "instigated" by them. Through whom, by what means, was this "instigated"? The record is certainly wholly silent on this subject. It is clear that the surrogate is not quite sure that this was practiced directly by Henry Pratt or Matilda, for he says he can point out "no particular act or attempt" on their part.

I have examined the other facts to which the surrogate refers as important in reaching his conclusions, one of the principal of which is the fact that Margaret, a maiden sister, with whom the testator had always lived, was not so bountifully provided for by this will as by the will made 15 years before. The testator, no doubt, had his reasons for this. His love for his sister had not abated, but she had reached the age of 82. He knew her needs and her circumstances, and, presumably, her wishes. She was on his mind, because he called back the scrivener and made him write the will over, giving her a small legacy,—more a testimonial of remembrance than a practical provision against want, but apparently she was satisfied. She was in the house, and knew the will was being written, and she opposed the revocation of the will. I think this fairly takes this fact out of consideration. As to his sister Anna, she took nothing by the will of 15 years before, nor is there any evidence that she was ever in testator's mind as an object of bounty. What evidence there is leads to the contrary conclusion. She was 78, married, childless, and far from being dependent or in need. Two of the adult children of the testator's deceased half-brother were not mentioned in the will made 15 years before, and the evidence does not disclose that he ever looked upon them as proper objects of his bounty. As to the other one (John Vosburgh), by the old will he was a beneficiary for $1,000. He then lived in Hudson, in this state, but removed to a Western state, where he now resides. It should not be counted as surprising, I think, if 15 years had wrought such changes that the testator no longer regarded John Vosburgh's welfare a matter of his concern. It is not surprising, either, that in 15 years there should have developed in the testator new wishes, grounded in new friendships, affections, loves, or hatreds. With what may have been the secret causes for changes of purpose neither court nor jury has anything to do. The occult forces which may move a testator's mind in the disposition of his property may be beyond the ken of the most learned court. The field of inquiry must be limited to the single inquiry, is this in fact the will of the testator?

The other fact which the surrogate apparently deems important, and sufficient to shift the burden of proof from the contestants to the proponents, viz. that Dr. Pratt for three days had acted as attending physician to the testator, and had made him daily professional visits, has little or no weight in creating a conclusion that fraud or undue influence was practiced. The long-existing intimacy was not thereby increased. Nothing was added to the confidential relations. It showed only a reliance upon the doctor's professional skill. There was here no weak mind to operate upon,—no habit shown of reliance upon the doctor's advice in matters outside of his professional skill. No importunities were shown. No dominant will in the physician. No fear on the part of the testator. This soil, it seems to me, is altogether too thin to grow a presumption of wrongdoing on, or to support even a healthy suspicion. All the qualified witnesses who could possibly have had any knowledge bearing upon the subject—and in number they were many—were produced. The only others who could know were Henry Pratt and Matilda, his wife. The contestants did not offer them as witnesses, and under the Code they could not be sworn for the proponents. They were not at liberty to testify to a negative,—that they had not importuned the testator. This, in the mind of the surrogate, apparently, was the thing lacking, the proof essential, the impossible. We have here a case of an elderly bachelor, with no one depending upon him, with testamentary capacity, in his own home, dictating to a reputable scrivener, in the presence of an old friend, and in the absence of all beneficiaries, a disposition of his estate which was correctly written down in the form of a will, and the will executed with all the formalities,—a total absence of any proof of any particular act or attempt on the part of any one to influence the testator in any way. Testing the will by its provisions, the beneficiaries named are shown to have been for years objects of concern on the part of the testator,—a concern in its nature almost paternal; objects whom he had more than once declared to Mr. Grey, two years before, should be the sole objects of his bounty. None of the facts, regarded alone or in combination with other facts, and none of the legitimate inferences deducible from any single fact, or the facts in array, point to "fraud, artifices, circumvention, or undue influence," and that conclusion on the part of the learned surrogate was an error of law. There being no conflict in the facts, there is no question for submission to a jury. In re Martin's Will, 98 N. Y. 197; In re Hunt's Will, 110 N. Y. 283, 18 N. E. 106.

The decree of revocation should be reversed, and the original decree probating the will should be affirmed, with costs in this court and in the surrogate's court in favor of appellants and against the petitioner. All concur.